**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

WOLF CREEK CONTRACTING COMPANY, LLC,

                Plaintiff,

v.                                  CIVIL ACTION NO.   2:19-cv-00672

NICHOLAS COUNTY SOLID WASTE AUTHORITY,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff Wolf Creek Contracting Company, LLC's ("Wolf Creek") partial Motion for Summary Judgment.   (ECF No. 76.)   For the reasons that follow, Wolf Creek's partial motion is **GRANTED IN PART** and **DENIED IN PART**.

*I.     BACKGROUND*

This action arises out of a contract between Wolf Creek and Defendant Nicholas County Solid Waste Authority (the "Authority") for the construction of a transfer station at the Authority's solid waste landfill facility in Calvin, West Virginia.   (ECF No. 77 at 1.)   In late February of 2018, the Authority invited bids for the construction of the transfer station (the "Project") and ultimately accepted Wolf Creek's bid.   (ECF No. 26 at ¶¶ 8–9.)   On March 15, 2018, the Authority and Wolf Creek entered into a contract (the "Contract").   (ECF No. 81–1.)

Pursuant to the Contract, Wolf Creek agreed to substantially complete all work on the Project on or before August 15, 2018.   (*Id.* at 5.)   Wolf Creek also agreed that the Project would be "free from all defects due to faulty materials or workmanship" and that it would "promptly

make such corrections as may be necessary by reason of such defects including the repairs of any damage to other parts of the system resulting from such defect."   (*Id.* at 8.)   Further, Wolf Creek would be considered in default of the Contract if it did "not diligently pursue[] the work on the Project towards completion . . . or . . . otherwise fail to perform [its] obligations under the Contract[.]"   (*Id.* at 9.)   The Contract finally contained a time-is-of-the-essence clause and a liquidated damages provision, under which Wolf Creek would be required to pay $1,000.00 per day for each day that completion on the Project was delayed beyond the completion date.[1]   (*Id.* at 5.)

     Wolf Creek did not substantially complete work on the Project until November 12, 2018. (ECF No. 1 at ¶ 12.)   Shortly after, the Authority retained Bays Technical Services, LLC, ("Bays Technical") to inspect the Project and report its findings.   (ECF No. 81–3.)   The Authority obtained two reports[2] from Bays Technical which identified structural concerns with the Project. (*Id.*)   On March 4, 2019, the Authority formally noticed default against Wolf Creek, citing a mechanic's lien that had been filed by Calvin Contractors, Inc., against the Authority for the alleged non-payment for services and materials and for structural concerns with the Project.   (ECF No. 81–5.)   Wolf Creek and the Authority subsequently met on March 19, 2019 to attempt to resolve the Authority's concerns.   (ECF No. 77 at 2.)   This discussion ultimately culminated in the parties entering into a settlement agreement (the "Settlement Agreement") on May 14, 2019. (ECF No. 26–1 at 29–40.)

---

[1] Wolf Creek additionally purchased a performance bond (the "Performance Bond") from SureTec Insurance Company ("SureTec") for the Authority's benefit in the amount of One Million Six Hundred Fifty Thousand Three Hundred Five Dollars ($1,650,305.00) for the Project.   (ECF No. 81–2.)

[2] The second of these reports was a revision of the first, which was updated following a joint site visit with Bays Technical and representatives from Wolf Creek.   (*See* ECF No. 81–3 at 1.)   Prior to this joint visit, Wolf Creek disputed the initial findings in the first report.   (*See* ECF No. 81–4.)

Pursuant to the Settlement Agreement, the parties stipulated that Wolf Creek had substantially completed the Project on November 12, 2018.  (*Id.* at 32.)  Wolf Creek, in consideration for the terms of release and the payment schedule outlined in the Settlement Agreement, agreed to undertake certain corrective actions on the Project.  (*Id.* at 31–32.)  Wolf Creek was to complete the corrective actions by August 12, 2019, ninety (90) days from the execution of the Settlement Agreement.  (*Id.* at 32.)  The Settlement Agreement also contained a purported time-is-of-the-essence provision.  (*Id.* at 34.)  Under this provision, Wolf Creek agreed that it would pay $500 per day in liquidated damages for "every day that the construction of the Project is not finished before 90 days from the date of this Agreement," which was to be drawn against the retainage outlined in the agreement's pay schedule.  (*Id.*)

The Settlement Agreement further outlined the pay schedule to which the Authority agreed in exchange for the work Wolf Creek promised to perform.  (*Id.*)  First, upon completion of the grading of the ground surface and hydroseeding, Wolf Creek was required to submit its final invoice to the Authority within 30 days.  (*Id.*)  Second, upon receipt of Wolf Creek's final invoice, the Authority was required to pay the final invoice and "release to Wolf Creek fifty percent (50%) of the retainage."  (*Id.*)  Third, the Authority was to hold the remaining fifty percent of the retainage until Wolf Creek completed, and the Authority approved, the corrective actions outlined in the Settlement Agreement.  (*Id.*)

On July 10, 2019, the Authority received Wolf Creek's invoice for hydroseeding and a request for 50% of the retainage in the amount of $82, 515.25.  (ECF Nos. 81–8, 81–9.)  On July 29, 2019, the Authority's Board of Directors approved the hydroseeding invoice and issued a

payment to Wolf Creek for $40,763.69.[3]   (ECF No. 81–10.   *See also* ECF No. 77–5 at ¶ 1.)

During this July 29 meeting, the Board additionally discussed paying Wolf Creek the 50% of the

retainage, but decided to withhold the payment, citing Wolf Creek's perceived failure to comply

with the Settlement Agreement.   (ECF No. 81–11.)

On August 12, 2019, Wolf Creek proposed that the parties extend the 90-day period in the

Settlement Agreement to September 16, 2019, stating that while neither the Authority nor Wolf

Creek had met all obligations, Wolf Creek's engineers felt "they [were] close to delivering their

recommendations."   (ECF No. 81–12.)   However, citing Wolf Creek's default under the Contract

and failure to comply with the Settlement Agreement, the Authority declined Wolf Creek's request

for additional time.   (ECF No. 81–13.)   Shortly thereafter, on August 14, the Authority submitted

a bond claim to SureTec and demanded that SureTec assume responsibility for the completion of

the Project.   (ECF No. 81–14.)   To date, SureTec has not accepted this claim.   (ECF No. 81 at

5.)

Wolf Creek initiated this action by filing a complaint in this Court on September 18, 2019.

(ECF No. 1.)   The Authority filed its answer and counterclaim against Wolf Creek on December

9, 2019.   (ECF No. 15.)   Subsequently, and by leave of the Court, the Authority filed an amended

counterclaim, naming both Wolf Creek and SureTec as counterdefendants.   (ECF No. 26.)

Those counterclaims are not the subject of the instant motion.

Wolf Creek has asserted two claims against the Authority.   (*See* ECF No. 1.)   Count I is

a cause of action for breach of contract, in which Wolf Creek alleges that the Authority materially

breached the Settlement Agreement by failing to pay 50% of the retainage and by barring Wolf

---

[3] Wolf Creek did not receive this payment until August 14, 2019, two days after the 90-day period contemplated by the Settlement Agreement had expired.   (ECF No. 77–1 at ¶ 12.)

4

Creek from further work on the Project.   (*Id.* at ¶¶ 50, 54.)   Count II asserts a claim for unjust enrichment, alleging that the Authority, by improperly withholding payment of the retainage funds, has received the benefit of work and services performed by Wolf Creek without compensation. (*Id.* at ¶¶ 58–61.)

Wolf Creek filed its partial motion for summary judgment on September 14, 2020.   (ECF No. 76.)   Following a stipulation by the parties, the Authority filed its response in opposition on October 5, 2020.   (ECF No. 81.)   Thereafter, Wolf Creek filed its reply on October 19.[4]   (ECF No. 85.)   With the briefing complete, this motion is ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment.   It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact."   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

---

[4] The Court notes that on October 16, Wolf Creek filed a third-party complaint against Centec Engineering, PLLC. (ECF No. 84.)

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A failure to respond in and of itself, however, does not show that the moving party is entitled to a judgment as a matter of law. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). "Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what is has before it whether the moving party is entitled to summary judgment as a matter of law." *Id.*; *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact . . . , the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . .").

## III.    DISCUSSION

Wolf Creek asks this Court for summary judgment in its favor on several issues. First, Wolf Creek asserts that it is entitled to 50% of the retainage, in the amount of $82,515.25, under the Contract. (ECF No. 76 at 1.) Next, and regardless whether the Court finds in its favor on the retainage, Wolf Creek asserts that it is entitled to declaratory relief, including that the Authority breached the Settlement Agreement by failing to make payment of 50% of the retainage; as a result of the Authority's breach, that Wolf Creek is excused from performing its remaining obligations under the Settlement Agreement and that the Authority is not entitled to demand that SureTec assumes responsibility for those obligations; the Authority breached the Contract by refusing to

allow Wolf Creek to perform any warranty work on the Project, that Wolf Creek thereby did not breach the Contract for failing to perform any warranty work, and that the Authority is not entitled to demand that SureTec assumes responsibility for completion of the warranty work; the Authority is barred from recovering liquidated damages under the terms of the Settlement Agreement; the Authority has waived any demand under the Contract that Wolf Creek construct additional stormwater drainage facilities, pursuant to the Settlement Agreement; and the Authority is responsible for the design and specifications for structural fill placement and concrete materials on the Project, pursuant to the Contract.   (ECF No. 76 at 1–2.)   The Court shall address each of these arguments in the order presented by Wolf Creek.

   *A.  The 50% Retainage*

   Wolf Creek argues that the Authority had a duty to pay it 50% of the retainage based on the explicit language of the Settlement Agreement.   (ECF No. 77 at 6.)   Wolf Creek asserts that the language of the Settlement Agreement is "clear and unambiguous," such that the Court cannot consider any extrinsic evidence as to the meaning or alteration of the terms of the agreement.   (*Id.* at 6–7.)   Therefore, Wolf Creek asserts that the Settlement Agreement required the Authority to pay Wolf Creek, once Wolf Creek had completed the grading of the ground surface and hydroseeding and submitted its final invoice.   (*Id.* at 7.)

   In response, the Authority argues that Wolf Creek's motion is premature, as discovery is continuing and the parties still need to depose expert witnesses.   (ECF No. 81 at 7.)   The Authority cites a recent decision of this Court for the proposition that "summary judgment is appropriate only after the opposing party has had adequate time for discovery.   (*Id.* (citing *Greenbrier Hotel Corp. v. Goodman-Gable-Gould/Adjusters Int'l*, No. 5:19-CV-00772, 2020 WL

2500254, at *1 (S.D. W. Va. May 14, 2020).)[5]  In support of this argument, the Authority has

submitted an affidavit pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.  (*See* ECF

No. 81–22.)   The Authority also argues that Wolf Creek's intention to file a third-party complaint

against Centec Engineering—which has since been filed—is further proof that Wolf Creek's

motion is premature.   (*Id.*)   Additionally, the Authority argues that "even without further

discovery," it is clear that Wolf Creek materially breached the Settlement Agreement "by failing

to ever even attempt to comply with the time-is-of-the-essence provision[.]"   (*Id.* at 8.)   Because

this failure constitutes a *prima facie* material breach of the agreement, the Authority argues that

Wolf Creek is not entitled to the 50% retainage payment.   (*Id.* at 9.)

   *1.   Premature Motion for Summary Judgment*

   "The burdens applied to parties bringing and contesting motions for summary judgment

are carefully crafted to balance the competing interests of affording litigants all opportunities to

be heard on their claims and to promote judicial economy."   *Greenbrier Hotel Corp. v. Goodman-*

*Gable-Gould/Adjusters Int'l.*, Civ. Action No. 5:19-cv-00795, 2020 WL 2500254, at *2 (S.D. W.

Va. May 14, 2020).   As discussed previously, the moving party's burden in bringing a motion for

summary judgment is to demonstrate that there is no dispute as to a material fact and that the party

is entitled to judgment as a matter of law.   *Id.*   "However, this standard is manifestly unfair to the

party resisting summary judgment if it has not had an adequate opportunity to explore the moving

party's factual allegations through discovery."   *Id.* (citing *Miller v. Dell Financial Servs., L.L.C.*,

Civ. Action No. 5:08-cv-01184, 2009 WL 1362485 at *2 (S.D. W. Va. May 13, 2009)).

---

[5] While the Authority quotes this opinion from Judge "Johnstone," the Court is unaware of any Judge Johnstone in
this district.   (ECF No. 81 at 7.)

Typically, a motion for summary judgment is premature when the parties have not had adequate time for discovery. *Id.*

Here, the Court does not believe that Wolf Creek's motion on this issue is premature. While what the Court believes to be an adequate time for discovery is usually found in its scheduling orders, see *id.*, here, the parties have had since December 9, 2019, to engage in formal discovery. (*See* ECF No. 16.)   The original scheduling order, which has admittedly been amended in light of the ongoing COVID-19 pandemic and considerations in this action, provided until July 9, 2020 to complete discovery. (*Id.*)   The first amended scheduling order extended the close of discovery until October 9, 2020, a date which had already passed by the close of briefing on this motion. (*See* ECF No. 59.)   This allowed for more than 10 months of discovery, which in the Court's view, is more than adequate for the instant motion.

The Court therefore denies the Authority's request for more discovery on this issue. While Rule 56(d) affidavits are typically "'broadly favored and should be liberally granted' in order to protect non-moving parties from premature summary judgment motions," see *Citizens Bank of Kentucky v. Oaks, LLC*, Civ. Action No. 2:17-cv-02364, 2018 WL 2306667 (S.D. W. Va. May 21, 2018), the Authority has had more than adequate time and discovery to defend itself on Wolf Creek's motion.[6]   Moreover, and as will be explained in more detail in the forthcoming analysis, the Authority has failed to show how Wolf Creek's expert's opinion regarding the time-is-of-the-essence provision would have any relevance on the Authority's failure to pay 50% of the

---

[6] The Court is further unpersuaded by the Authority's claim that it needs more discovery to present its defense on this issue, especially considering the Authority also claims that it has presented "affirmative evidence already available" to it. (*See* ECF No. 81–22 at ¶ 13.)   Moreover, it appears that at least two of the experts that remain to be deposed are two of the Authority's own witnesses, which would logically mean that that the discoverable evidence is already available to them.   The Court also notes that no affidavits—save for the Rule 56(d) affidavit—were filed along with the Authority's response.

retainage.   *See Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) ("Rule 56(f) motions may be denied, however, if the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."). Therefore, the Court **DENIES** the Authority's request for additional discovery under Rule 56(d).

    2.   *Payment of 50% of the Retainage*

    "In West Virginia, 'a contract is formed when the minds of the parties meet. The writing, if unambiguous, is the indisputable evidence of the agreement.'"   *Nichols v. Springleaf Home Equity Inc.*, 2012 WL 777289, at *3 (S.D. W. Va. Mar. 8, 2012) (quoting *Brown v. Woody*, 127 S.E. 325, 326–27 (W. Va. 1925).   "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."   Syl. pt. 1, *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 714 (W. Va. 1996).

    "Whether or not time is of the essence of a contract is determined from the language used in the instrument and the circumstances surrounding it. The principle object is to determine the intent of the parties."   *Creasy v. Teacher*, 173 S.E.2d 332, 334 (W. Va. 1970).   *See also Bailey v. Savage*, 236 S.E.2d 203, 206 (W. Va. 1977) ("If the parties would make time of the essence, they should so stipulate in the contract. And even when such contract does make time of the essence, it may be waived by indulgence or subsequent contract of the parties.") (quoting Syl. pts. 2, 3, *Collins v. Thomas*, 105 S.E. 897 (W. Va. 1921)).   In *Waddy v. Riggleman*, the West Virginia Supreme Court of Appeals stated as follows:

>    When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at or within the time specified in the contract is essential *in order to enable that party to require performance from the other party.*   It does not simply mean that delay will give rise to a right of action against

that party, although the breach of any promise in a contract, including one dealing with the time of performance, will have that effect.  Nor does the phrase merely mean that performance on time is a material matter, but rather, that it is so material that exact compliance with the terms of the contract in this respect is essential to the right to require counterperformance.

606 S.E.2d 222, 236 (W. Va. 2004) (quoting 15 Williston on Contracts § 46:2, at 395–97) (emphasis in original).

The parties to this motion intensely dispute who materially breached the Settlement Agreement.  Despite these competing contentions, one item appears to be clear: Wolf Creek is entitled to payment of 50% of the retainage.

Section 4 of the Settlement Agreement governs how Wolf Creek was to be paid for the work performed under the Settlement Agreement.  (ECF No. 26–1 at 34.)  That section reads as follows:

[T]he Authority will pay Wolf Creek as follows:

(a) Upon completion of the grading of the ground surface and hydroseeding on the Project, Wolf Creek will submit its final invoice within thirty (30) days to the Authority, pursuant to the payment provisions and schedule of values outlined in the Contract.

(b) Upon receipt of Wolf Creek's final invoice, the Authority will pay the final invoice and release to Wolf Creek fifty percent (50%) of the retainage.

(c) The Authority shall withhold fifty percent (50%) of the retainage until the Authority approves the work identified in Section 2 of this Agreement, such approval not to be unreasonably withheld.  If Wolf Creek satisfactorily and timely completes these items, the Authority will release the remaining fifty percent (50%) retainage to Wolf Creek.

(*Id.*)  This section establishes, in no uncertain terms, that the Authority is obligated to pay Wolf Creek for the final invoice and the first 50% of the retainage once (1) Wolf Creek completed the grading of the ground surface and hydroseeding on the Project; (2) submitted its final invoice

11

within 30 days; and (3) the Authority received the final invoice. Subpart (b) of this section explicitly ties "receipt of Wolf Creek's final invoice" to payment of that invoice *and* to 50% of the retainage.

This subsection stands in contrast to subsection (c), which allows the Authority to withhold the remaining 50% of the retainage "until the Authority approves the work identified in Section 2[.]" (*Id.*) Subpart (c) finishes by stating that, once Wolf Creek "satisfactorily and timely completes [the work in Section 2], the Authority will release the remaining fifty percent (50%) retainage[.]" (*Id.*) This language provides a clear distinction between the two payments by allowing the Authority to withhold payment of the second 50% retainage pending the Authority's approval of the work performed. No such language appears in subpart (b), and it is clear and unambiguous that these two payments were contemplated as separate. Indeed, once the grading and hydroseeding was completed and the final invoice submitted, the Authority had the obligation to release payment to Wolf Creek. There is no dispute that Wolf Creek completed the grading of the grounds and hydroseeding; submitted its final invoice; and that the Authority received the invoice. (*See* ECF Nos. 76–5 at 2; 81 at 4; 81–8.) The Authority was obligated to release 50% of the retainage once these conditions were met.

The Authority claims that Wolf Creek committed an anticipatory breach of the Settlement Agreement by not complying with the completion deadline and violating the time-is-of-the-essence provision and that, as a result of Wolf Creek's breach, it is not required to issue payment. (ECF No. 81 at 9–10.) The Court is not persuaded by this argument.

In West Virginia, "[a]n 'anticipatory breach' is defined as 'one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evincing

an intention to refuse performance in the future.'"  *Stiles Family Ltd. P'ship, III, LLP v. Riggs &*

*Stiles, Inc.*, Case No. 16-0220, 2016 WL 6819788 at *3 (W. Va. Nov. 18, 2016) (quoting 17A Am.

Jur. 2d Contracts, § 448).   The West Virginia Supreme Court has held as follows:

> The general rule in cases of anticipatory breach of contract is that where one party
> repudiates the contract and refuses longer to be bound by it, the injured party has
> an election to pursue any of three remedies: he may treat the contract as rescinded
> and recover on quantum meruit so far as he has performed; or he may keep the
> contract alive for the benefit of both parties, being at all times ready and able to
> perform, and at the end of the time specified in the contract for performance, sue
> and recover under the contract; or he may treat the repudiation as putting an end to
> the contract for all purposes of performance, and sue for the profits he would have
> realized, if he had not been prevented from performing.

Syl. Pt. 1, *Annon v. Lucas*, 185 S.E.2d 343 (1971).   However, "[a]nticipatory repudiation and

breach of contract, sufficient to give a cause of action, or to use as a defense to suit by the

repudiating party, must be *unequivocal, absolute and positive.*"   Syl. Pt. 1, *Mollohan v. Black*

*Rock Contracting, Inc.*, 235 S.E.2d 813 (1977) (emphasis added).

The Authority has not presented any evidence that Wolf Creek unequivocally, absolutely

and positively repudiated the Settlement Agreement.   The Authority cites to its Board meeting

minutes from July 29, 2019—already three weeks from when Wolf Creek submitted its final

invoice—but these minutes only establish that the Board decided to issue payment for the invoice

but not the 50% retainage.   (*See* ECF No. 81–10 at 2.)   But there is no evidence in these minutes

that would establish Wolf Creek's intentions regarding the unfinished work on the Project.   The

Authority also cites an email from the Authority's Executive Director Robyn Stroh ("Stroh") to

the Authority's attorney.   (ECF No. 81–11.)   In this email, Stroh advises that the Board decided

to pay the invoice, but agreed with the attorney's recommendation to withhold the retainage

payment.   (*Id.*)   Stroh also advised the attorney to prepare to "pull[] the bonds" on August 13,

"as [Wolf Creek] ha[s] not attempted to comply with the settlement agreement."  (*Id.*)   But the Authority does not explain how Stroh's perceptions equate to an unequivocal, absolute and positive repudiation by Wolf Creek.   Finally, the Authority cites to an email, dated August 12, 2019, from Wolf Creek's Vice President Donald Gatewood ("Gatewood") to Stroh as further evidence.  (ECF No. 81–12.)   In this email, Gatewood informs Stroh that while "neither party has yet met all of the anticipates [*sic*] obligations[7] set forth in the Settlement Agreement," the agreement contemplated a possible extension of the deadline.  (*Id.*)   Gatewood then proposes a 90-day extension of the deadline, with an early September status meeting because their "engineers feel they are close to delivering their recommendations."  (*Id.*)   Far be it from showing Wolf Creek unequivocally, absolutely and positively repudiated or intended to repudiate the Settlement Agreement, this email would seem to show Wolf Creek striving for compliance with the agreement.

The Authority's own admissions also seem to contradict its own evidence and the proffered testimony of its expert witness.   In response to Wolf Creek's request for admission, the Authority admitted that Wolf Creek still had sufficient time to complete all of the remaining work identified in the Settlement Agreement.  (ECF No. 85 at 15–16.)   Moreover, Stroh and Joseph Sulesky ("Sulesky")—the Authority's engineer and expert witness—exchanged emails in mid-July concerning Wolf Creek's progress on the project.   In those emails, Sulesky confirmed that the final invoice "looks ok" and then confirmed with Stroh that the hydroseeding and grading had been completed.  (ECF No. 85–1 at 1–2.)   Stroh also confirmed for Sulesky that Wolf Creek had "correctly repair[ed] the push wall bolts," as well as completed the gates and fencing.  (*Id.* at 1.)

---

[7] Gatewood notably identifies that the Authority, at the time, had yet to pay the final invoice as well as the retainage. (ECF No. 81–12.)

Sulesky and Stroh then expressed their frustration with Wolf Creek, but ultimately resigned to seeing "if [Wolf Creek] [was] going to attempt to complete the work." (*Id.*) By their own words, the Authority apparently believed that Wolf Creek still had time to meet the August 12 deadline. This statement stands in contrast with what Sulesky is "expected to testify," that he knew "well in advance of the deadline" that Wolf Creek did not intend to finish the work. (ECF No. 81 at 10.) But tellingly, Stroh and Sulesky confirmed that the remaining retainage would be withheld until the Project was complete. (*Id.*)

In the Court's view, however, even if it were to accept the Authority's argument that Wolf Creek committed an anticipatory breach, it would still not relieve the Authority of its obligation to pay Wolf Creek the 50% of the retainage. The payment of 50% of the retainage was conditioned on two items: Wolf Creek's completion of the grading and hydroseeding, and Wolf Creek's submission of its final invoice. Wolf Creek indisputably satisfied both conditions.

For the foregoing reasons, the Court **GRANTS** Wolf Creek's motion. The Authority is hereby **DIRECTED** to remit payment to Wolf Creek in the amount of $82,515.25, plus pre- and post-judgment interest from July 10, 2019, the date on which the Authority received Wolf Creek's final invoice.

*B. Material Breach of the Settlement Agreement*

Despite this finding, the Court is not convinced that summary judgment is appropriate as to whether the Authority's failure to pay the first 50% of the retainage constituted a material breach of the Settlement Agreement. In West Virginia, "a material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Mullins v. GMAC Mortg., LLC*, Civ. Action No. 1:9-cv-00704, 2011

WL 1298777 at *3 (S.D. W. Va. Mar. 31, 2011).   *See also Holderby v. Harvey C. Taylor Co.*, 104 S.E. 550, 552 (W. Va. 1920) ("[Recission] is not permitted for a casual, technical, or unimportant breach or failure of performance, but only for a breach so substantial as to tend to defeat the very object of the contract[.]")   In West Virginia, a material breach of a contract by a party will excuse the other party to the contract from further performance.   *Id.   See also West Virginia Human Rights Com'n v. Smoot Coal Co., Inc.*, 412 S.E.2d 749, 754 (W. Va. 1991) ("[O]nly a material failure of performance by one party discharges the other."); *Emerson Shoe Co. v. Neely*, 129 S.E. 718, 719 (W. Va. 1925) ("The general rule of contracts is that a party is not excused by the other party's breach of contract unless the breach is material or essential.").

Case law addressing what constitutes a material breach of contract is rather undeveloped in West Virginia.   Still, "[t]he standard for determining materiality must necessarily be both imprecise and flexible to further the purpose of securing for each party that party's expectation of an exchange of performances."   23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2020.)   In West Virginia, though, whether a breach of contract is material is generally a question of fact for the jury.   *Milner Hotels, Inc. v. Norfolk & Western Ry. Co.*, 822 F.Supp. 341, 346 (S.D. W. Va. 1993). *See also Weber v. Wells Fargo Bank, N.A., et al.*, Civ. Action No. 3:20-cv-48, 2021 WL 833949 at *6 (N.D. W. Va. Mar. 4, 2021).   *Milner Hotels*, one of the few decisions to expound upon what constitutes a material breach, annunciated the following analysis:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances, including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Milner Hotels, Inc.*, 822 F.Supp. at 346 (quoting Restatement (Second) of Contracts § 241 (1981)).

Here, analysis of these factors would inevitably lead to the resolution of factual disputes, as both parties accuse the other of materially breaching the Settlement Agreement.   On the evidence presented, the Court cannot determine as a matter of law whether or not the failure to pay 50% of the retainage upon receipt of Wolf Creek's final invoice was so fundamental to the Settlement Agreement that the Authority's failure to pay could be deemed to defeat the agreement's purpose.   Importantly, the Settlement Agreement does not address the possibility of a breach by either party, save for the liquidated damages provision.   (*See generally* ECF No. 26–1 at 29–40.)   *See, e.g.*, 23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2020) ("Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision.").   The Authority also argues that the time of payment to Wolf Creek is not as essential as Wolf Creek's completion of the work in accordance with the purported time-is-of-the-essence clause, which would essentially render the failure to pay immaterial.[8] (ECF No. 81 at 9 (citing 15 WILLISTON ON CONTRACTS, § 46:6 (4th ed. 2020).)

---

[8] Wolf Creek asserts that this argument is "irrelevant and completely misses the point" because it is arguing that the Settlement Agreement should be enforced, not negated.   (ECF No. 85 at 9.)   Of course, if the Authority is found to have materially breached the Settlement Agreement by failing to pay Wolf Creek 50% of the retainage, then Wolf Creek would be excused from their remaining obligations under the settlement.   *Emerson Shoe Co.*, 129 S.E. at 719.

Relatedly, both parties insist that time was of the essence in this agreement, evidenced by the explicit wording in Section 5 of the Settlement Agreement.   (*See* ECF No. 26–1 at 34.)   But, the parties disagree as to its application—and indeed, Wolf Creek even argues the *opposite* as well, that the liquidated damages provision effectively nullifies the time-is-of-the-essence provision.[9] (ECF No. 85 at 8, n.6.)   The Authority asserts that the time-is-of-the-essence provision applies *only* to the work to be performed by Wolf Creek, which, as noted above, would render its failure to pay immaterial.   (ECF No. 81 at 9.)   Wolf Creek, conversely, argues that the entire Agreement was subject to the time-is-of-the-essence provision, which would necessarily mean that any failure by either party to satisfy any condition constituted a material breach.   (ECF No. 77 at 9.)   The Settlement Agreement itself is not clear as to whether the timing of performance was essential only to the work to be completed by Wolf Creek, or whether it applied to the entire agreement between the parties.

Because these issues of fact preclude summary judgment on the materiality of the breach, so too do they preclude the declaratory relief sought by Wolf Creek that it was excused from its obligation to complete the remaining work on the Project.   Therefore, and for the foregoing reasons, the Court **DENIES** Wolf Creek's motion as to the materiality of the Authority's failure to pay, and further **DENIES** Wolf Creek's motion as to the declaration by the Court that it was not obligated to complete the remaining work under Section 2 of the Settlement Agreement.

---

[9] Wolf Creek again relies on *Vecellio v. Bopst*, 6 S.E.2d 708 (W. Va. 1939) for the proposition that by including both a clause for time-is-of-the-essence and for liquidated damages, the two inconsistent provisions should not be construed to make time of the essence for the performance of the contract.   (ECF No. 85 at 8, n.6.)   While the Court questioned whether this proposition was as well established in West Virginia as Wolf Creek claimed, this Court reasoned that "the Settlement Agreement contains numerous other references that are not 'entirely inconsistent' with a time-is-of-the-essence provision, which, when read in conjunction with the liquidated damages clause, renders the intent of the parties far from clear."   (ECF No. 78 at 12.)   The waters remain muddy on this specific issue, further bolstering the Court's conclusion that summary judgment on the materiality of the alleged breaches is inappropriate.

### C.  SureTec's Obligations under the Performance Bond

Next, Wolf Creek argues that as a result of the Authority's material breach, SureTec is not obligated to assume responsibility for completing the remaining work under Section 2 of the Settlement Agreement.   (ECF No. 77 at 12.)   In response, the Authority argues that Wolf Creek cannot argue on behalf of SureTec, as it "is not Wolf Creek's argument to make[.]"   (ECF No. 81 at 11.)   Moreover, even if Wolf Creek could assert this argument on behalf of SureTec, the Authority argues that SureTec—through the Performance Bond—pledged "that it would satisfy Wolf Creek's contractual obligations in the event Wolf Creek defaulted on the Contract or, later, the Settlement Agreement."   (*Id.*)   Wolf Creek, in reply, interprets the Authority's argument as one of constitutional standing and asserts that it has standing as it is in "direct privy of contract" with both SureTec and the Authority, and that if the Authority has a claim against SureTec, then SureTec has a claim against Wolf Creek.   (ECF No. 85 at 18–19.)   Notably, though a counterdefendant in this matter, SureTec has not joined in this argument.

> For a plaintiff to have constitutional standing, he must satisfy the following three elements:
>
> (1) the plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical"; (2) there must be "a causal connection between the injury and the conduct complained of," meaning that the injury must be "fairly traceable to the challenged action of the defendant," and not the result of the independent action of some third party not before the court; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Domestic Violence Survivors Support Group, Inc. v. Crouch*, Civ. Action No. 2:18-cv-00452, 2020 WL 5949897 at *5 (S.D. W. Va. Oct. 7, 2020) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).   "Both individual and organizational plaintiffs must satisfy the standing requirement."   *Id.*

19

Wolf Creek argues that because it is in privity of contract with both the Authority and SureTec, and that SureTec itself is jointly and severally liable to the Authority for any material breach of the Settlement Agreement by Wolf Creek, it therefore has standing to assert a claim for declaratory relief because Wolf Creek would thus be directly liable to SureTec for costs incurred in connection with the Project under the terms of the Performance Bond.   (ECF No. 85 at 18–19.) The Court disagrees.

"Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'"   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992).   "Thus, we have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."   *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (citations omitted).

Here, Wolf Creek has not established the imminence or concreteness of its injury.   To be sure, the Authority has named SureTec as a defendant in its amended counterclaim in this action. (ECF No. 26 at 13.)   SureTec, as expected, has denied the allegations and counterclaims against it.   (ECF No. 41.)   Importantly, however, to trigger SureTec's obligations under the Performance Bond, Wolf Creek itself must have defaulted under either the Contract or the Settlement Agreement.   (*See* ECF No. 81–2.)   No such determination has yet been made.   Indeed, Wolf Creek's own words highlight the as-yet-hypothetical harm: "*If* SureTec incurs any costs in connection with the Project, [*then*] it will have a claim against Wolf Creek."   (ECF No. 85 at 19 (emphasis added).)   *See, e.g.*, *Sanitary Bd. of City of Charleston, West Virginia v. Pruitt*, Civ.

Action No. 2:16-cv-03060 at *4 (S.D. W. Va. Mar. 29, 2018) (finding plaintiff lacked standing because alleged future harm was speculative, hypothetical, and not imminent).

Regardless, even if the Court were to find that Wolf Creek had standing to assert this issue, the Court's findings above concerning issues of fact over the materiality of the parties' alleged breaches would lead the Court to deny the requested declaration. Because the Court cannot determine as a matter of law whether Wolf Creek or the Authority materially breached the contract—and indeed, whether the time-is-of-the-essence provision is to be read and applied as such—Wolf Creek is not entitled to the relief it seeks for SureTec.

For the foregoing reasons, Wolf Creek's motion is **DENIED** to the extent it seeks a declaration from the Court that SureTec is not obligated to complete the remaining work on the Project pursuant to the Performance Bond.

### D. Warranty Work

Next, Wolf Creek argues that it has not breached the Contract in failing to make repairs or adjustments under the warranty provision. (ECF No. 77 at 12.) Relatedly, Wolf Creek also argues that SureTec is not obligated to assume Wolf Creek's responsibility for completing the work under the warranty provision. (*Id.* at 13.) Wolf Creek argues that the Authority was required to "give notice of observed defects with reasonable promptness," but that the Authority only provided notice after August 12, 2019, at which point Wolf Creek had been barred from the property. (*Id.* at 12.) Therefore, Wolf Creek requests that the Court find that the Authority breached the Contract by refusing to allow Wolf Creek to perform warranty work on the Project; that Wolf Creek has not breached the Contract by failing to undertake any of the warranty work;

and that the Authority cannot demand SureTec to take responsibility for the completion of the work.  (*Id.* at 15.)

Paragraph 15 of the original Construction Contract reads, in pertinent part, as follows:

[W]ork on the Project will be free from defects and will conform with the requirements of this Agreement, the plans and specifications of the Construction Plans, any Change Orders approved by the [Authority], and all governmental requirements.  Work on the Project that does not conform to these requirements, including substitutions not properly approved and authorized may, at [the Authority's] sole discretion, be considered defective.

***

[Wolf Creek] shall guarantee all materials and equipment furnished and Work performed for a period of one (1) year from the date of Substantial Completion of the system that the completed system is free from all defects due to faulty materials or workmanship and [Wolf Creek] shall promptly make such corrections as may be necessary by reason of such defects including the repairs of any damage to other parts of the system resulting from such defects.   The [Authority] will give notice of observed defects with reasonable promptness. In the event that [Wolf Creek] should fail to make such repairs, adjustments,  or other Work that may be made necessary by such defects, the [Authority] may do so and charge [Wolf Creek] the cost thereby incurred.   The Performance Bond shall remain in full force and effect in the amount of twenty-five percent (25%) of its original amount during this one-year guaranty period.

(ECF No. 26–1 at 8.)

At the outset, the Court notes that any part of the Project that did not conform with the Contract, the designs or specifications, change orders, or governmental requirements would be considered defective and such a finding would be in the Authority's sole discretion.   (*Id.*) Furthermore, the term "reasonable promptness" is not defined by the Contract.   Finally, the Contract also establishes that the Performance Bond "shall remain in full force and effect" throughout the guaranty period, though only at 25% of its original amount.   (*Id.*)

22

Wolf Creek's motion must be denied on this issue as the record reveals numerous disputes of material facts.   First, Wolf Creek argues that "[a]ll of the warranty items" that the Authority complains about were only raised after August 12, 2019, after which time Wolf Creek has been prohibited from entering the property.   (ECF No. 77 at 12 (emphasis in original).)   But not only does Wolf Creek fail to specifically identify what warranty work is complained of,[10] it also fails to address that the Authority raised numerous concerns of defects in the Bays Technical report, authored on November 29, 2018, and revised December 21, 2018.   (*See* ECF No 26–1 at 16–19.) The Authority again notified Wolf Creek in March 2019 of defects on the Project, noting that the transfer station "requires significant remediation work."   (*Id.* at 20–21.)

Second, it is apparent that the Settlement Agreement also contemplated these deficiencies. (*Id.* at 30.)   The recitals of the Settlement Agreement specifically identifies the Bays Technical report, as well as several meetings between the parties in the leadup to the agreement where the parties met "concerning resolution of the remaining items on this Project."   (*Id.* at 30.)   Section 2 of the Settlement Agreement goes on to identify no fewer than eight separate tasks needing completion or correction on the Project.   (*Id.* at 30–32.)   Frankly, the Court is perplexed how Wolf Creek has ignored these notices only to argue that it never received notice of the deficiencies until after August 12, 2019, as the Settlement Agreement itself would seem to stand in recognition of deficient work.

---

[10] In its counterclaim, the Authority actually does allege that Wolf Creek failed to correct numerous specific items in violation of the Settlement Agreement.   (*See* ECF No. 15 at 8–10, ¶¶ 2–10.)   Additionally, though, the Authority alleges that Wolf Creek breached the original Contract by "fail[ing] to construct the Transfer Station free from defects, in violation of Section 15 of the Construction Contract."   (*Id.* at 10, ¶ 14.)   Paragraph 14 of the Counterclaim actually cites to the Bays Technical report, attached as Exhibit 1 to the Counterclaim.   (*Id.*)

While not clear in its argument, Wolf Creek may additionally be arguing that because the Authority had already committed a material breach of the Settlement Agreement through its failure to pay, Wolf Creek's obligations, including the warranty work, are excused. As discussed above, whether the Authority or Wolf Creek materially breached the Settlement Agreement such that either would be excused from their obligations is a question of fact for the jury.  *Milner Hotels, Inc. v. Norfolk & Western Ry. Co.*, 822 F.Supp. 341, 346 (S.D. W. Va. 1993).   These issues of fact, including the materiality of any alleged breaches under the Contract, also prevent the Court from finding that SureTec is not obligated to perform the warranty work under the Performance Bond, notwithstanding the question of Wolf Creek's standing to bring such a claim, as discussed previously.

Therefore, for the foregoing reasons, Wolf Creek's motion is **DENIED** to the extent it seeks a finding and declaration that the Authority has breached the Contract by failing to notify Wolf Creek of deficient work and that Wolf Creek has not breached the Contract for failing to perform the warranty work under the Contract.   Wolf Creek's motion is further **DENIED** to the extent it seeks a declaration from the Court that SureTec is not obligated to complete the remaining warranty work pursuant to the Performance Bond.

### E.  Liquidated Damages

Wolf Creek next argues that the Authority is no longer entitled to liquidated damages, in the amount of $500 per day, as the Authority has barred Wolf Creek from entering the property on which the Project is located since August 12, 2019.   (ECF No. 77 at 13.)   Simply, Wolf Creek argues that the Authority cannot recover damages "that are <u>measured in days of delay</u>" when the

Authority is responsible for actually causing the delay.   (*Id.* (emphasis in original).)   The Authority has failed to respond to this argument.

West Virginia has long allowed liquidated damages, as follows:

(1) Where the damages are uncertain and not readily capable of ascertainment in amount by any known or safe rule, whether such uncertainty lies in the nature of the subject, or in the particular circumstances of the case; or (2) where from the nature of the case and tenor of the agreement, it is apparent that the damages have already been the subject of actual fair estimate and adjustment between the parties.

Syl. pt. 1, *Charleston Lumber Co. v. Friedman*, 61 S.E. 815 (W. Va. 1908); *see also Stonebraker v. Zinn*, 286 S.E.2d 911, 914 (W. Va. 1982).   However, "[w]here the performance of a contract according to its terms has been prevented by the oblige therein, he will not be permitted to recover the liquidated sum stipulated to be paid on a breach."   *Mitchell v. Davis*, 80 S.E. 491, 492 (W. Va. 1913).   *See also United States v. United Engineering & Constructing Co.*, 234 U.S. 236, 242 (1914) ("[T]he better rule is that when the contractor has agreed to do a piece of work within a given time, and the parties have stipulated fixed sum as liquidated damages, not wholly disproportionate to the loss for each day's delay, in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time.")

Here, the Authority is not entitled to liquidated damages because it has prohibited Wolf Creek from continuing to work on the Project past the August 12, 2019 deadline.   As evidenced, the Settlement Agreement both included a liquidated damages clause, asserting damages of $500 per day that the Project remained unfinished past the deadline, as well as an option for extending the deadline upon written agreement by the parties.   (ECF No. 26–1 at 32, 34.)   The Authority declined Wolf Creek's request for an extension to the deadline.   (ECF No. 81–13.)   Most importantly, the Authority has prohibited Wolf Creek from entering onto the property or

continuing work on the Project since August 12, 2019.   (ECF Nos. 1 at ¶ 44; 15 at ¶ 44; 81–13 at 2.)   The Authority cannot now claim liquidated damages against Wolf Creek for its own actions in delaying—and in fact, prohibiting—Wolf Creek's performance under the Settlement Agreement.

Therefore, for the foregoing reasons, Wolf Creek's motion is **GRANTED** as to the award of liquidated damages under the Settlement Agreement.

*F.   Stormwater Drainage Facilities*

Next, Wolf Creek argues that under the explicit terms of the Settlement Agreement, the Authority has waived any demand that Wolf Creek construct additional stormwater drainage facilities.   (ECF No. 77 at 14.)   The Authority has not responded to this argument.

The Settlement Agreement, Section 3(b), dictates that "[t]he Authority waives any demand under the Contract or otherwise that Wolf Creek construct additional stormwater drainage facilities."   (ECF No. 26–1 at 33.)   The terms of the Settlement Agreement are unambiguous, and the intent of the parties is therefore clear.   *See* Syl. pt. 1, *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 714 (W. Va. 1996).

Therefore, for the foregoing reasons, Wolf Creek's motion is **GRANTED**, and the Authority is deemed to have waived any demand for Wolf Creek to construct additional stormwater drainage facilities under the Contract or otherwise.

*G.   The Design and Specifications for Structural Fill Placement and Concrete Materials*

Wolf Creek finally argues that, under the Contract, it bears no responsibility for "designing or designating the specifications for structural fill placement or concrete material," as those materials were prepared by Centec and provided by the Authority in connection with the bidding

process.   (ECF Nos. 77 at 14; 76–1 at ¶¶ 3–4.)   Because it did not prepare these designs or specifications, Wolf Creek asserts that it is entitled to a declaration that the Authority was responsible for the design and specifications for structural fill placement and concrete materials on the Project.   (ECF No. 77 at 15.)   The Authority has not responded to this argument.

In support of this argument, Wolf Creek has submitted the affidavit of Donald Gatewood ("Gatewood"), Vice President of Wolf Creek.   (ECF No. 76–1.)   Gatewood attests that Section 29 of the Contract between Wolf Creek and the Authority incorporated several "Contract Documents," including technical specifications for the Project.   (*Id.* at ¶ 3.)   Gatewood further states that these technical specifications were provided by the Authority to Wolf Creek and other contractors as a part of the bidding process for the Project.   (*Id.* at ¶ 4.)   Gatewood asserts that "Wolf Creek had a limited design role on the Project, as the majority of design items were completed by the [Authority], through its engineers and consultants."   (*Id.* at ¶ 6.)   He further attests that Wolf Creek "had no responsibility for designing or designation the specifications for structural fill placement" or for "designing or designating the specifications for concrete[.]"   (*Id.* at ¶¶ 9, 11.)   Further attached to Gatewood's affidavit is a copy of the technical specifications for the Project that were provided during the bidding process by the Authority.   (ECF No. 76–1 at 4–38.)   The Contract itself identifies that Centec prepared the plans and specifications and specifically incorporated the Technical Specifications.   (ECF No. 1–2 at ¶¶ 2, 29.)

The record and Gatewood's affidavit establish that there is no genuine issue as to any material fact.   First, "[a]ffidavits submitted to support or oppose a motion for summary judgment 'shall be made personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'"

27

*M & M Medical Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 164 (4th Cir. 1992) (quoting Fed. R. Civ. Pro. 56(e)[11]).    Gatewood's affidavit has met these requirements. Gatewood has demonstrated that he has personal knowledge as Wolf Creek's Vice President; set forth facts that would be admissible in evidence; and has demonstrated that he is competent to testify to those matters.

Second, the Authority has failed to respond to this argument.    While its failure to respond does not warrant automatic judgment in Wolf Creek's favor, see *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993), a review of the record reveals that there is no fact in dispute on this item.    The Authority, through its engineers and Centec, designed and designated the requirement for structural fill placement and concrete materials on the Project.    (ECF No. 1–2 at ¶¶ 2, 29.)    The Authority has not presented any evidence that would introduce a genuine issue as to any material fact on this matter.

Therefore, for the foregoing reasons, Wolf creek's motion is **GRANTED**, and the Authority is deemed to be responsible for the design and specifications for structural fill placement and concrete materials on the Project.

### IV.    CONCLUSION

For the foregoing reasons, Wolf Creek's partial motion for summary judgment, (ECF No. 76), is **GRANTED IN PART** and **DENIED IN PART**.    The Court hereby **ORDERS** the Authority to remit to Wolf Creek in the amount of $82,515.25, plus pre- and post-judgment interest from July 10, 2019.

**IT IS SO ORDERED**.

---

[11] The requirements of Rule 56(e) are now located in Rule 56(c)(4).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 24, 2021

_____
THOMAS E. JOHNSTON, CHIEF JUDGE